Filed 1/23/26  Kim v. Koo CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| DEAN KIM,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JACOB KOO,<br><br>    Defendant and Appellant. | G064063<br><br>(Superior Ct. Case No. 30-2021-01178855)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Sheila O. Recio, Judge. Affirmed.

Grignon Law Firm, Margaret M. Grignon, Anne M. Grignon, and Vakili & Leus, Sa'id Vakili, David N. Schultz, and Stephen P. Hoffman, for Defendant and Appellant.

Horvitz & Levy, Steven S. Fleischman, Gaspard Rappoport, and Kahana & Feld and Sharon Oh-Kubisch, for Plaintiff and Respondent.

Jacob Koo appeals from a judgment in favor of Dean Kim following a bench trial. The trial court found that notwithstanding a written agreement stating that Koo would pay $500,000 to Kim for Kim's interest in a limited liability corporation, Koo actually had agreed to pay $850,000. Koo contends the court's ruling violated the parol evidence rule, which generally bars extrinsic evidence from varying the terms of an integrated written agreement. For the reasons discussed below, we conclude substantial evidence supported the court's finding there was no integrated written agreement. Thus, the parol evidence rule did not apply, and accordingly, we affirm the judgment.

STATEMENT OF THE CASE

I.

COMPLAINT AND ANSWER

On January 14, 2021, Kim filed a complaint against Koo, seeking enforcement of a $350,000 promissory note. The complaint alleged Kim and Koo created Damon Capital, LLC (Damon Capital) to operate a high-end bed and mattress store. Subsequently, Kim agreed to sell his 50 percent interest in Damon Capital to Koo. The complaint alleged the purchase price was $850,000. However, Kim could only obtain a $500,000 loan from Wells Fargo Bank. To facilitate the loan, on or about August 31, 2015, the parties executed a Transfer Agreement, a $500,000 promissory note, and a $350,000 promissory note. The Transfer Agreement and the $500,000 note were dated August 31, 2015, and the $350,000 note was dated September 1, 2015. The complaint further alleged that after the Transfer Agreement and the $500,000 note were submitted to Wells Fargo, the bank expressed concerns. The Transfer Agreement and the $500,000 note were revised to address Wells

2

Fargo's concerns, but the $350,000 note was left unchanged. However, Koo never made any payments on the note.

On April 1, 2021, Koo filed an answer generally denying the allegations and raising numerous affirmative defenses. On June 22, 2022, he amended his answer to add additional affirmative defenses.

II.

STIPULATED FACTS

Before trial on the complaint, the parties filed a joint stipulation setting forth disputed and undisputed facts. They stipulated that Kim and Koo each initially invested $350,000 into Damon Capital and owned a 50 percent interest in the company. In March 2015, Koo sought to obtain a loan from Wells Fargo to fund his purchase of Kim's membership interest in Damon Capital. On September 2, 2015, Koo signed four documents: (1) a $350,000 note in favor of Kim, (2) a $500,000 note in favor of Kim dated August 31, 2015, (3) the Operating Agreement of Damon Capital, and (4) a Membership Interest Transfer Agreement dated August 31, 2015 ("August Transfer Agreement"). The parties disputed whether the $350,000 note related to Koo's purchase of Kim's membership interest.

On September 18, 2015, the parties executed a Termination Agreement, which did not reference the $350,000 note. Kim asserted the Termination Agreement was drafted to cancel, revoke, terminate or otherwise render unenforceable the August Transfer Agreement and the $500,000 note. Koo asserted the Termination Agreement affected the August Transfer Agreement, the $500,000 note, and the $350,000 note. On September 23, 2015, the parties executed a revised Membership Interest Transfer Agreement (the "September Transfer Agreement"), which complied with Wells Fargo Bank's requested changes.

3

The August Transfer Agreement and September Transfer Agreements were admitted into evidence at trial. The agreements both provide the purchase price for Kim's membership interest in Damon Capital was $500,000, and referenced the $500,000 note. Their preambles state: "This Agreement supersedes any and all agreements and understandings which predate this Agreement." Additionally, paragraph 10 of both agreements state:

"<u>Entire Agreement</u>. This Agreement supersedes any and all other agreements, either oral or in writing, between the Parties to this Agreement with respect to the subject matter hereof and contains all the covenants and agreements between said Parties with respect thereto, and each Party to this Agreement acknowledges that no representations, inducements, promises, or agreements, orally or otherwise, have been made by any Party, or anyone acting on behalf of any Party which are not embodied herein, and that any other agreement, statement, or promise concerning the subject matter set forth in this Agreement shall be of no force or effect except in a subsequent modification in writing signed by the Party to be charged."

The notes were also admitted into evidence. The $500,000 note states that Koo agreed to pay the note in exchange for Kim's 50 percent membership interest in Damon Capital. The $350,000 note states it was for "VALUE RECEIVED," with no further reference.

### III.

### TRIAL TESTIMONY

At trial, Kim testified that in January 2015, he asked Koo to buy him out or purchase his 50 percent membership interest in Damon Capital. At that time, Kim had lost trust in Koo, and wanted to exit their professional business relationship to salvage their friendship. Koo offered $850,000.

4

Although Kim believed his interest was worth between 1.25 to 4 million dollars, he accepted the price to end their professional relationship. Koo, however, lacked the funds to pay. In February or March 2015, he informed Kim he could only qualify for a $500,000 loan from Wells Fargo, and Kim agreed to lend Koo the remaining amount ($350,000) via a carryback note. After Wells Fargo required additional covenants to approve Koo's loan, Kim signed the September Transfer Agreement to facilitate the loan approval. Kim was never told by Koo or anyone else that the integration clause in the agreement extinguished the $350,000 note until five years later when Koo reneged on paying the note.

Yong Duk (John) Chung testified he was asked to draft the various agreements and notes. He understood the purchase price would be $850,000. However, he was asked to draft a promissory note for $500,000 and another note for $350,000, which led to him learning that Koo would only qualify for a $500,000 loan. Chung was informed that the "main agreement[ ] should only have $500,000 for [Koo] to be able to get a loan. So [$]350[,000] should not be incorporated into the main agreement." He testified that notwithstanding the integration clause, the parties intended the $350,000 note to be part of the purchase price. Chung also prepared the September Transfer Agreement. He did not believe this agreement canceled the $350,000 note. It had an integration clause because that was part of the template he used to draft agreements.

Koo testified the purchase price of Kim's interest was $500,000. He came up with this figure based on a representation from Wells Fargo that he was likely to qualify for a $500,000 loan. Koo testified the $350,000 amount represented the value of gifts from Kim that he wanted to return.

5

## VI.

### TRIAL COURT RULINGS AND JUDGMENT

Following the close of evidence and the parties' arguments, the trial court issued its tentative decision in a written statement. The court found the parties entered into an agreement to purchase Kim's interest in Damon Capital for $850,000, which included the $350,000 note.

Koo objected to the tentative decision on numerous grounds. As relevant to this appeal, he asserted the trial court failed to address whether the September Transfer Agreement was a "completely integrated contract." He argued the tentative decision conclusorily found the parties had agreed to a $850,000 purchase price, which, he contended, "is belied by, and flatly contrary to, the express language of the September Transfer Agreement."

On February 26, 2024, the trial court issued the judgment after bench trial and final statement of decision. The court stated: "Based on the evidence presented, including credibility determinations, the court finds that the parties entered into an agreement, wherein [Koo] agreed to buy out [Kim's] interest in Damon Capital, LLC for total sale price of $850,000, which included a $350,000 promissory note. . . . To be clear, the court finds the $350,000 promissory note to have been part of the consideration for the buyout agreement and to be enforceable." "The court further notes that it did not find [Koo's] testimony credible when testifying that the buyout agreement with [Kim] was for only $500,000. Although the documents presented to Wells Fargo suggested that the deal was for only $500,000, those documents appear to have been drafted and presented to Wells Fargo for the purpose of securing the loan, and not for the purpose of limiting the true and actual buyout agreement between the parties to $500,000. Importantly, [Koo] would not have qualified for the $500,000 loan if Wells Fargo was informed of the

6

$350,000 promissory note. And even with the crafty presentation to Wells Fargo, [Koo] qualified for only $500,000. The documents were an attempt to mislead Wells Fargo about the true terms of the agreement between the parties." The court entered judgment in favor of Kim, and awarded damages.

Koo timely appealed.

DISCUSSION

I.

APPLICABLE LAW

"The parol evidence rule is codified in Code of Civil Procedure section 1856 and Civil Code section 1625. It provides that when parties enter an *integrated* written agreement, extrinsic evidence may not be relied upon to alter or add to the terms of the writing." (*Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1174, fn. omitted, italics added.) In contrast, "parol evidence is admissible to explain, supplement, or even *contradict* the terms of an *unintegrated* agreement." (*Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 340, italics added.)

Civil Code section 1625 provides that "[t]he execution of a contract in writing, whether the law requires it to be written or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument." Here, the September Transfer Agreement would supersede the $350,000 promissory note if it was an integrated agreement because the September Transfer Agreement specifically states it concerns the purchase of Kim's interest whereas the $350,000 note does not explain its subject matter.

Code of Civil Procedure section 1856, subdivision (a) provides: "Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to the terms included therein may not be

7

contradicted by evidence of a prior agreement or of a contemporaneous oral agreement."[1] Section 1856, subdivision (b) provides: "The terms set forth in a writing described in subdivision (a) may be explained or supplemented by evidence of consistent additional terms unless the writing is intended also as a complete and exclusive statement of the terms of the agreement."

As a panel of this court explained: "Section 1856 creates two levels of contract integration or finality: (1) the parties intended the writing to be the final expression of their agreement; and (2) the parties intended the writing to be the complete and exclusive statement of the terms of their agreement." (*Kanno v. Marwit Capital Partners II, L.P.* (2017) 18 Cal.App.5th 987, 999, fn. omitted (*Kanno*).) "If a writing falls within level 1 (the writing is a final expression) then a prior or contemporaneous oral agreement is admissible if it does not contradict the writing, and evidence of consistent additional terms may be used to explain or supplement the writing." (*Id.* at pp. 999-1000.) "If a writing falls within level 2 (complete and exclusive statement) then evidence of consistent additional terms may not be used to explain or supplement the writing." (*Id.* at p. 1000.)

Section 1856, subdivision (d) provides that "[t]he court shall determine whether the writing is intended by the parties as a final expression of their agreement with respect to the terms included therein and whether the writing is intended also as a complete and exclusive statement of the terms of the agreement." "In considering whether a writing is integrated, the court must consider the writing itself, including whether the written agreement appears to be complete on its face; whether the agreement

---

[1] All further statutory references are to the Code of Civil Procedure, unless stated otherwise.

8

contains an integration clause; whether the alleged parol understanding on the subject matter at issue might naturally be made as a separate agreement; and the circumstances at the time of the writing." (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 953–954 (*Founding Members*).) "Under California law, the presence of an integration clause in the contract is not conclusive but is a factor which 'may help resolve' that issue." (*Kanno*, *supra*, 18 Cal.App.5th at p. 1001, quoting *Masterson v. Sine* (1968) 68 Cal.2d 222, 225,)

"Whether a contract is integrated is a question of law when the evidence of integration is not in dispute." (*Founding Members*, *supra*, 109 Cal.App.4th at p. 954.) "If the issue of integration requires a resolution of a conflict in the evidence or of credibility, then the trial court's determination is reviewed under the substantial evidence standard." (*Kanno*, *supra*, 18 Cal.App.5th at p. 1001.)

II.

ANALYSIS

Here, the trial court concluded the September Transfer Agreement is an unintegrated agreement, notwithstanding the fact that it had an integration clause. It determined based on the "evidence presented" and "credibility determinations" that the document was "presented to Wells Fargo for the purpose of securing the loan, and not for the purpose of limiting the true and actual buyout agreement between the parties to $500,000." It found that "the parties entered into an agreement, wherein [Koo] agreed to buy out [Kim's] interest in Damon Capital, LLC for a total sale price of $850,000, which included a $350,000 promissory note."

The trial court's finding on integration required resolution of conflicting evidence and credibility determinations because Kim and Koo presented differing versions about the agreement to buyout Kim's membership interest. The court credited Kim's version, which explained why the $350,000 promissory note was not included in the purchase price set forth in the transfer agreement. As the court found, the note was separated from the other agreements to secure the loan from Wells Fargo because Koo "would not have qualified for the $500,000 loan if Wells Fargo was informed of the $350,000 promissory note." Kim's trial testimony, along with Chung's corroborating testimony, thus constituted substantial evidence to support the court's finding that the September Transfer Agreement is not an integrated agreement. (See *Lui v. City and County of San Francisco* (2012) 211 Cal.App.4th 962, 969 ["The testimony of a single witness may be sufficient to constitute substantial evidence"].) Because there was no integrated agreement, the parol evidence rule did not apply. The trial court could consider the $350,000 promissory note and conclude it was part of the buyout agreement and enforceable.[2]

Koo argues the trial court did not make any findings regarding integration and the parol evidence rule in the tentative decision or the final

[2] In his reply brief, Koo argues there is no conflicting evidence because the only conflicting evidence is "parol evidence" that contradicts the express terms of the September Transfer Agreement. But the testimony of Kim and Chung can properly be considered in determining "whether the alleged parol understanding on the subject matter at issue might naturally be made as a separate agreement; and the circumstances at the time of the writing." (*Founding Members*, *supra*, 109 Cal.App.4th at p. 954.) Their testimony concerned the parties' "actions" in drafting the various agreements. (*FPI Development, Inc. v. Nakashima* (1991) 231 Cal.App.3d 367, 391 ["It is only when there are conflicting inferences about the *actions* of the parties, i.e., what happened, that a question of fact is presented"].)

statement of decision. We disagree. Although the terms "integration" and "parol evidence" do not appear in the statements of decision, the court expressly stated the documents presented to Wells Fargo did not reflect the "true and actual buyout agreement." Thus, the September Transfer Agreement is not a "final expression of their agreement with respect" to the buyout of Kim's membership interest or "a complete and exclusive statement of the terms of the agreement." (§ 1856, subds. (a) & (b).) Accordingly, the September Transfer Agreement is not an integrated agreement and the parol evidence rule does not apply to bar consideration of the $350,000 promissory note.

Koo's remaining arguments concern whether the September Transfer Agreement is a completely integrated agreement, i.e., a level 2 integrated agreement as defined in *Kanno, supra*, 18 Cal.App.5th 987, and whether any exception to the parol evidence rule applied. Given our affirmance of the trial court's finding that the September Transfer Agreement is not an integrated document, whether partially or completely integrated, these arguments are irrelevant. However, we will address one issue raised in the reply brief regarding consideration of collateral agreements in the context of integration.

In *IIG Wireless, Inc. v. Yi* (2018) 22 Cal.App.5th 630, 640 (*IIG Wireless*), a panel of this court stated: "Generally, the parol evidence rule states that evidence of an oral agreement inconsistent with a written contract is inadmissible even where the contract is not integrated. This rule is based on sound logic and policy; when a contract is reduced to writing, it is presumed to contain all of the material terms, and it cannot reasonably be presumed that the parties would intend two contradictory terms to be part of the same agreement. (*Gerdlund v. Electronic Dispensers International* [(1987)

11

190 Cal.App.3d 263, 271 (*Gerdlund*)].)" Koo relies on the first sentence in the quote above to argue the $350,000 promissory note cannot be considered even if the September Transfer Agreement is not integrated. However, that language contradicts well-settled law that the parol evidence rule applies only when an agreement is integrated. (See. e.g., *Founding Members*, *supra*, 109 Cal.App.4th at p. 953 ["If the agreement is partially integrated, the parol evidence rule applies to the integrated part"]; 11 Williston on Contracts (4th ed. 2024) § 33:14 ["application of the parol evidence rule depends on the existence of a valid integrated contract"].) In any event, the conflict may be resolved by construing the term "integrated" to mean complete integration. As the *Kanno* court noted, "Case law sometimes uses the term 'integration' to mean a complete integration, i.e., the second level of integration. Justice Traynor did so *in Masterson v. Sine*, *supra*, 68 Cal.2d at page 225." (*Kanno*, *supra*, 18 Cal.App.5th at p. 1000.) The use of "integration" to mean complete integration in *IIG Wireless*, *supra*, 22 Cal.App.5th 630 is confirmed when we examine the cited *Gerdlund* case.

In *Gerdlund*, the appellate court stated: "Our Supreme Court held in *Masterson v. Sine*, *supra*, 68 Cal.2d 222, that [an integration] clause, while it certainly helps to resolve the issue, does not of itself establish an integration; the collateral agreement itself must be examined in order to determine whether the parties intended it to be a part of their bargain. *Masterson*, however, does not go so far as to permit proof of a collateral agreement which contradicts an express provision of the written agreement. The reason for this clear: it cannot reasonably be presumed that the parties intended to integrate two directly contradictory terms in the same agreement. Under *Masterson* then, parol evidence can be admitted only "'to prove the existence of a separate oral agreement as to any matter on which

12

the document is silent and which is not inconsistent with its terms. . . ."'"" (*Gerdlund*, *supra*, 190 Cal.App.3d at pp. 270–271.)

Thus, the reference to "integrated" refers to complete integration. When determining whether a separate oral agreement should be integrated into a partially integrated written agreement, a term in the collateral agreement cannot be integrated if it is inconsistent with or contradicts a term in the written agreement. The reason is that "it cannot reasonably be presumed that the parties intended to integrate two directly contradictory terms in the same agreement." (*Gerdlund*, *supra*, 190 Cal.App.3d 263, at p. 271.) However, this principle of contract integration does not apply to unintegrated agreements.

The same language from *Gerdlund* quoted above suggests that collateral agreements with inconsistent or contradictory terms cannot be used to determine whether an agreement is integrated. For example, the *Kanno* court stated: "On the issue of contract integration, "'the court must consider not only whether the written instrument contains an integration clause, but also examine the collateral agreement itself to determine whether it was intended to be a part of the bargain. [Citations.] However, in determining the issue of integration, the collateral agreement will be examined only insofar as it does not directly contradict an express term of the written agreement; 'it cannot reasonably be presumed that the parties intended to integrate two directly contradictory terms in the same agreement.'"'" (*Kanno*, *supra*, 18 Cal.App.5th at p. 1001.) However, when integration is viewed as complete integration, any confusion is resolved. Collateral agreements may be considered along with the parties' testimony about why the agreements were drafted and executed when determining *whether* a written agreement is a "final expression" of the parties' agreement,

13

but they cannot be used to contradict the terms of a written agreement the parties *actually* intended to be a final expression of their agreement. (§ 1856, subd. (a).)

In sum, the trial court may not consider extrinsic evidence to contradict the terms of an integrated agreement. However, the court may consider extrinsic evidence to contradict the terms of an unintegrated agreement. (See *Guz v. Bechtel Nat. Inc.*, *supra*, 24 Cal.4th at p. 340 ["parol evidence is admissible to explain, supplement, or even contradict the terms of an unintegrated agreement"].) In this case, the court found the September Transfer Agreement was not integrated. That finding was supported by substantial evidence. Thus, the parol evidence rule did not apply, and the court could consider and enforce the $350,000 promissory note.

### DISPOSITION

The judgment is affirmed. Respondent is entitled to his costs on appeal.


DELANEY, J.


WE CONCUR:


MOTOIKE, ACTING P. J.


BANCROFT, J. *


*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14